THE PHILIP MINCH. THE CHRIS GROVER. THE ALVA B.

(District Court, N. D. Ohio, E. D.　June 6, 1912.)

No. 2,478, in Admiralty.

COLLISION (§ 61*)—STEAMER IN TOW AND DREDGE—FAULT OF TUGS.

While the steamer Minch was being towed stern first into the entrance of the Cuyahoga river by two tugs, one at the stern and one at the bow, her bow swung around and came into collision with the dredge Napoleon, which was at work on the west side of the river; the bow hawser parting when the tug attempted to prevent the swing. The hawser was furnished by the steamer, was purchased from a reputable dealer, was of proper material and dimensions, and had been inspected and tested. The entrance to the river was 325 feet wide, leaving 245 feet of clear water to the eastward of the dredge. *Held*, that the steamer was not in fault, but that the collision was due to the fault of the tugs in passing unnecessarily near the dredge.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*

Collision with or between towing vessels and vessels in tow, see note to The John Englia, 100 C. C. A. 581.]

In Admiralty. Suit for collision by the Great Lakes Dredge & Dock Company, owner of the dredge Napoleon against the steamer Philip Minch, Kinsman Transit Company, claimant, with petition by such claimant against the tugs Chris Grover and Alva B., the Great Lakes Towing Company, claimant. Decree against the tugs.

George Eichelberger, for Great Lakes Dredge & Dock Co.

Goulder, Day, White, Garry & Duncan (O. D. Duncan, of counsel), for Kinsman Transp. Co.

Hoyt, Dustin, Kelley, McKeehan & Andrews (George W. Cottrell, of counsel), for Great Lakes Towing Co.

DAY, District Judge. This case was begun by the filing of a libel by the Great Lakes Dredge & Dock Company, owner of the dredge Napoleon against the steamer Philip Minch, for damages claimed to have been sustained by the dredge in consequence of a collision between the barge and the Minch in the Cleveland harbor, July 1, 1908. Later the owner of the Minch (the Kinsman Transit Company) filed a petition against the tugs Chris Grover and Alva B., under the fifty-ninth rule in admiralty (29 Sup. Ct. xlvi), setting up the fact that the two tugs mentioned had lines from the steamer and were engaged in assisting her up the Cuyahoga river at the time of the accident in question.

The Great Lakes Towing Company filed answers to both the petition and original libel, denying fault on the part of the tugs. Both the steamer Philip Minch and the tugs Chris Grover and the Alva B. claim, through their proctors, in oral argument and in their briefs, that the collision was the result of an inevitable accident.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

I cannot reach this conclusion. It appears from the testimony that on July 1, 1908, at about 4 o'clock in the afternoon, the steamer Philip Minch was taken from a position alongside of another steamer and the East Breakwater at Cleveland, Ohio, by the tugs Chris Grover and Alva B., the Alva B. being at her stern and the Chris Grover at her bow, and located in this manner the steamer was taken stern first into the entrance between the pier marking the entrance to the Cuyahoga river. The dredge Napoleon was lying on the westerly side of the river at a short distance inside of the pier, engaged under a government contract, with a government inspector on board designating the work to be done. As the Minch, in tow of the tugs, proceeded into the river entrance, the port bow of the Minch came in contact with the dredge. The wind was from the northeast and blowing about 10 or 11 miles an hour. The direction of the piers was about north and south, and they ran parallel to each other at a distance of about 325 feet apart. The Minch was a freighter, 480 feet in length and 52 feet beam; the Chris Grover is a steam tug, 69 feet in length and 18 feet beam; the Alva B. is a steam tug, 73 feet in length and 18 feet beam; the dredge Napoleon was 135 feet in length and about 40 feet beam.

The captain of the Minch procured the services of the tugs. As the Minch, in tow of the tugs, proceeded to the river entrance, it appears from the testimony that the Minch had up some steam and was assisting the tugs in their work of towing the steamer into the river. As the Minch proceeded into the river near to the position of the Napoleon, the stern of the Minch being pulled up the river partly by her own power and partly by the tugs, the Minch being towed up the river stern first, when the stern of the steamer passed the dredge, her bow was swung to the westward. The tug Chris Grover had a line on the bow of the steamer, and while endeavoring to prevent this swinging to the westward toward the dredge Napoleon the line parted and the collision occurred. The captain of the Minch caused the anchor to be dropped; but the swinging of the bow was not prevented, and the dredge was accordingly damaged.

It is clear from the testimony that there was no fault on the part of the dredge Napoleon. She was engaged in government dredging, under the supervision of a government official, who was on board of the dredge. It is apparent, then, that the collision was caused by the maneuvering of the tugs and the steamer in going up the river. It is well established that, where an anchored steamer is moored at a proper place and is struck by a moving steamer, the presumption is that the moving vessel is at fault. The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943; The Minnie (D. C.) 87 Fed. 780; The Ogemaw (D. C.) 32 Fed. 919; Henderson v. City of Cleveland (D. C.) 93 Fed. 844.

The case was tried by the proctors for the Minch on the theory that the tugs were negligent on executing the maneuver, resulting in the collision, and by the proctor for the tugs on the theory that the line furnished by the steamer was insufficient. There is considerable conflict of testimony; but it appears that the Great Lakes

Towing Company, the owner of the tugs, had a contract with the owner of the Minch whereby the Minch was to furnish a good and sufficient line. It appears from the testimony that the towline was bought from a reputable ship chandler, was of proper material and size for the purpose for which it was used, that it had been inspected and showed no defect ascertainable by visual inspection, and that it had been tested and found to be proper and sufficient. The vessel being equipped with an article of this nature, it was sufficient. The Olympia (D. C.) 52 Fed. 985; The Richmond (D. C.) 114 Fed. 208.

The Minch not being at fault in the furnishing of this towline, the next inquiry would be as to whether or not the tugs were at fault in executing the maneuver in question, which resulted in the collision. The Minch employed two tugs to tow her into the Cuyahoga river. It was apparent from the testimony that the tugs had charge of the steamer from the time they took her in tow under the breakwater until she was placed in position at her dock up the river. The steamer had up steam to assist the tugs in the maneuvering. As was said in The Margaret, 94 U. S. 494, 24 L. Ed. 146, the tugs were the dominant minds and wills in the adventure. The tugs were in control of the navigation of this boat, and it is quite apparent to me, from the testimony, that all the Minch was doing was to use such power of her own as would assist these tugs so far as practicable. The tug which had the stern line of the Minch, it being borne in mind that the Minch was being towed stern first up the river, furnished the power. The tug at the bow was to assist in the steering of the boat. It is plain that the Minch was placed in a position whereby an emergency signal was necessary on the bow tug, and an unusual strain was brought on the towline while the bow of the Minch was swung towards the dredge, and the line thus parted. The anchor on the Minch was let go as soon as it was practicable, but the collision could not be prevented. Despite the parting of the towline, the real cause of the collision was the manner of the maneuvering employed by the tugs in taking this tow up the river. There was a wide channel, clear and unobstructed for a distance of some 245 feet to the east of the scow. It was broad daylight. There was no wind sufficient to cause the collision, had the tugs exercised proper care in the manner in which they towed this vessel. The collision could have been prevented by the exercise of ordinary care and maritime skill. The conceded facts and probabilities all point to fault on the part of the tugs as the proximate cause of the collision. The maneuver by which the steamer was brought into the river was an improper one. The tugs were in control of the situation. Untimely precautions were taken to prevent the swinging of the bow of the Minch, and when the bow tug finally undertook to stop this swinging the line parted and the collision occurred.

I am accordingly of the opinion that the tugs Alva B. and Chris Grover were at fault in causing this collision.